Okay, the next argued case is number 19-1157, ECC CENTCOM Constructors, LLC. against the Secretary of the Army, Mr. Hare. Good morning, Your Honors. May it please the Court. In this case, appellant believes that the contracting officer for this construction project on a Navy transient enlisted quarters in Manama Base, Bahrain, abused his discretion in terminating ECC, our client, by default. We believe this case is consistent with this Court's prior rulings in Lisbon Constructors v. United States and Darwin Construction Company v. United States. Lisbon has been cited approvingly in 108 cases. Most recently, interestingly enough, in Al Utique Manufacturing Contractors v. United States, the site on that is 143 Federal Claims 689. That case has actually been docketed in this Court on September 4th. ECC maintains the contracting officer abused his discretion in several ways that are very similar to Lisbon, Darwin, and Al Utique. One theme that runs through all these cases is this Court's concern about the requirement that a contracting officer who terminates for default evaluate whether the terminated defaulting contractor could complete the project sooner than the replacement contractor could be procured. In the hearing, we asked a number of questions of the contracting officer different ways, what kind of process did you go through, how did you make your determination on if the ECC, the allegedly defaulting contractor, could complete the project sooner than a replacement contractor. There is no real clear answer in the record that the contracting officer would never describe what process he went through. The clearest example in the appendix at appendix page 1014 and then onto the top of appendix 1015 kind of captures the issue we had. There was no evidence in the record, no discovery was ever provided, and no testimony was ever had that showed that the contracting officer did anything other than simply write a memo, a termination memo, that said he considered whether the project could be completed faster by ECC or a replacement contractor. But is that accurate? He had evidence as to the state of completion of the project? He had evidence as to the state of completion of the project, but that doesn't go to the material issue of whether he evaluated whether or not the ECC, the defaulting contractor, could have completed the project sooner than bringing in what ultimately was a replacement contractor named Vertex. There's two separate, there's a line of cases that the government cites, DCX, Empire, Imperial, and in those cases, they're different from the Lisbon line of cases. Lisbon stands for the proposition that there is, that the contracting officer is bound to exercise reasonable discretion in that terminating decision. That issue in these DCX and the other lines of cases is never gotten to or it's dealt with in a very clear evidentiary way. Are you saying that the discretion was abused when the project, I think it was undisputed, was only half done at the completion time? I believe the evidence that ECC put forward showed that the project was 64% complete at the time of termination, and that's in the record. The issue, the distinction between the two cases, or the two lines of cases, that this court has ruled on is just because the contractor is late, even if we stipulate, and Allutique at page 699 is very clear about this point, even if you stipulate that the contractor, defaulted contractor, is late, is missing the contract completion date, that's not the end of the inquiry in terms of whether the contracting officer has abused his discretion. There's a separate question, and it goes to what presumably is a policy position of the United States government. The FAR in section 49-202-3F states, 3F4 states that it's required, and the term is shall in the regulation, it's required that the government contracting officer review whether the project could be completed faster by the defaulting contractor, or whether it could be completed faster by re-procuring and completing. And presumably the policy rationale behind that is, the government already includes a liquidated damages clause in its contracts. So if the government is correct, if the contracting officer is correct, and the contractor actually is inexcusably late... Well, first of all, I mean, we do have case law that says not every single one of those factors in that particular regulation need to be actually considered, weighed, and with articulated findings by the contracting officer. Secondly, it seems like the contracting officer actually did consider this factor, but ultimately concluded that he had lost faith in ECC's unreliable estimates, and I think that's basically what he said. He said ECC is blown well past the time of completion provision in this contract, and when ECC comes forward with renewed proposals for end dates, it's already falling behind schedule for those renewed proposals. So I've really now, as the contracting officer that's responsible for managing this situation, have lost faith in ECC's ability to even give me a reliable new contract completion date. So when you're at a loss like that, we can debate whether that was a reasonable conclusion by the contracting officer, but given that the contracting officer did make that conclusion, it seems like he is telling us that he isn't in a position anymore to even weigh the relative timeliness of sticking with ECC versus going with another contractor. So I'd like you to explain that. Sure. So DCX stands for the proposition that a contracting officer is not bound, as you say, by the seven specific factors he's required to review. But it does say that it does provide useful evidence as to whether or not the contractor may have abuses discretion. I think the issue here is not whether or not ECC is late. I think the issue here that we think is important, and it serves the government's policy position behind 3F4, is that there's already a remedy for the government in the event that they are correct and the contractor is late. So what happened in this case, and it's very similar to— Well, it's not just being late per se. It's being late and then coming up with new proposals and then falling behind schedule with those unilaterally proposed schedules and then trying now for the poor contracting officer to guesstimate the reliability of yet another new proposed schedule from ECC. So the government, the Corps of Engineers, had a scheduler on the project. His name was Raymond Sundquist. And Mr. Sundquist consulted with the contracting officer on the submission of ECC's recovery schedule. And if you look in the appendix at page 1085 and 1086, the Corps of Engineers professional scheduler on the project came to the conclusion that ECC would have finished the project by November of 2016. That's both in the hearing transcript, which I just cited to you. It's also in the contemporaneous memorandum dated March 16th of 2016. What about 1082? Pardon me? A1082? A1085. No, I'm talking about A1082 where he says, so it can be done. I mean, it's not like it's impossible. Is it probable? Probably not. And he goes further and says, I would say not probable only because in the history of this project, they have struggled to meet their own schedules all the way through. And then further, I would say there's a very low probability that they would meet November 19th. So that's Mr. Sundquist, right? Yes, but that testimony, which was taken about a year and a half after the project was over or after they were terminated, contradicts what Mr. Sundquist said contemporaneously in Appendix 1142. So what happened was on the project, Mr. Sundquist wrote a memo, a two-page memo, which is Appendix 1141 and 1142, analyzing the recovery schedule. And he basically says in the memo, it looks like this is a more realistic recovery schedule. UCC seems to be responding to some of the concerns we've raised about subcontractor manpower and things of that nature. And then in his recommendation, which you see in the last paragraph at the bottom of Appendix 1142, in the third sentence he states, or third line, he states, it appears to be projecting an end of project date that should be achievable. And if you look back up four paragraphs up from there, he says the narrative states that the critical deliveries are the switchgear and the doors, and that is what is driving the new end of project date from September to November 2016. If we go back to the appendix, and you're citing to page 1082, which is where the government's lawyer was asking him to speculate on hypotheticals, which were not based on the contemporaneous documentation that he provided, you'll notice then on cross-examination, which is 1085 and 1086, I asked, starting on line 14, I asked Mr. Sundquist, and I just want to confirm that prior to the termination date, the advice that you gave or the analysis that you gave to Mr. DiMatti was that November 30th project date in the schedule was achievable if the manpower remained at the needed level and materials remained as planned. Is that correct? And he says, yes. And then my follow-up question to that was, in your statement, if the manpower remains at the needed level, from that I infer that from what you were analyzing, they, meaning the ECC, had supplied manpower consistent with this recovery schedule for at least a few months prior to, and he says, that's my recollection, yes. The problem was the contracting officer didn't actually support any of his conclusions that he wrote in his memorandum. They never produced a single email. They never produced a single document. No contemporaneous record to support the conclusion that he made. And it is particularly noteworthy that there were no emails because the contracting officer was here in D.C. The project's in Bahrain. The time difference means that most of the interaction between the D.C. folks and the project folks in Bahrain was done by email because of the time change. I think going to our argument that the contracting officer abused his discretion, so the schedule, the only person from the government side that was... The contracting officer said, for example, on 1014, that he just didn't trust ECC because of its past history, and he talks about a project where it took them over a year to finish the last 5% of the project. And so he just, based on their past history, he just can't believe that they're going to do it. I mean, isn't there... Even the thing you pointed me to from the analyst on the ground said, well, if we give them... If this effort is worth one more chance, then maybe it can be monitored closely so we'll know if they're going to screw up, basically. This is paraphrasing because I don't have that page in front of me. But both of these individuals seem, at a minimum, frustrated, recognizing that ECC has had multiple opportunities to comply with which it's failed to do, and that that is impacting the contracting officer's decision as to whether to trust ECC to be able to finish the project under any set of circumstances. Yes, it could be feasible. That doesn't mean it's going to happen, and the contracting officer has to figure out whether he thinks it's going to happen. And here he says he doesn't think he can trust that they can. But that doesn't alter his mandatory responsibility to evaluate whether ECC, limping along or however otherwise the contracting officer wanted to characterize it, could complete the project sooner than a replacement contractor. There's testimony... When you say could, it's not could. It's kind of would, right? I mean, does he believe ECC would actually get it done sooner, given their past history of many failures to do so? You bring in a different contractor that doesn't have a past history of all those failures, maybe you can trust them more, and therefore you have greater confidence. Well, on Appendix 1142, in that last paragraph, his own professional scheduler told him they could. He says, as far as recovery schedule, this is one of the more thorough attempts. With manpower loading, subcontractor buy-in... He told them they could. He didn't say he thought they would. Do you understand the difference? He said should, if you look at Line 3. Should be achievable. Should be achievable, but then he says, if this effort warrants one more chance to the contractors continuing towards finishing the project, I think this plan is one that can be monitored and tracked from a field perspective. If he didn't have doubt about whether they would actually get it done, he wouldn't have to throw in there. We can stay on top of them and watch them closely so that we'll know if they're not gonna do it. Because obviously, everybody was suspicious. I mean, ECC had had many shots at completion. Let's see, the stats. As of the completion date, you're only 37% complete. 37%, that's not close. That's not... That was at the time he was entertaining the show cause order, and that percentage was from the September 2015 project schedule. By the time they reached the termination date in April 2016, ECC, the government signed off on a pay request that showed 63% completion. I don't believe it's actually in the appendix, but it's in the trial record. You said that part of your argument is that they didn't bring in a different contractor. They kept the same personnel, except for what, the topmost management? So they did bring in a replacement contractor. They had a replacement, but then... But your argument, I thought you were putting great weight on that, other than having the insurer take over as the responsible person at top of the project, that everything else was the same. Vertex was the replacement. Is that correct? Your Honor, Vertex was the replacement contractor. Vertex hired 11 of the 13 management personnel that were formerly ECC employees. They went from being ECC management employees to being Vertex, the takeover contractor management employees. They also retained the same, what's called super subcontractor, Koheiji. Koheiji was doing the actual work. Koheiji was doing 90% of the actual... Just out of curiosity, did the contracting officer know at the time he made the decision that that's what their intention was? He did, and in fact, he was relieved of his duties as contracting officer a few months after the replacement contractor, and Major Hahn was the replacement contractor. Major Hahn testified at the hearing at Appendix 701 and 702 that Mr. DiMatti's decision to keep the same management and subcontractor was unreasonable. What do you think he would have thought of the decision to keep ECC? If he thought keeping a significant portion of ECC's employees was unreasonable, what do you think he would have thought about keeping ECC? It's a distinction without a difference because you basically took 500 laborers and 11 management personnel and changed out literally two... Vertex put two people in, two management people. The project was virtually unchanged from a work performance standpoint. You had the same team, the same management personnel, you just had a different corporate banner at the top, if you will. In fact, there's also testimony in the appendix from ECC's owner, Paul Sabrewall, his CEO, where at the time of termination, he informs Mr. DiMatti... This was in the trial transcript, the testimony. He informs Mr. DiMatti, if you terminate us, it's going to take a replacement contractor much longer to complete this project. Practically speaking, they terminated, they kept all the same management team, they kept the same super subcontractor who was doing all the work. They added two and a half months of additional time in order to negotiate the takeover contract with Vertex. And then what's interesting, at appendix 1146 and 1147, after this changeover takes place, you can see in these slides, so at the time of termination, ECC was averaging 523 men per day in March of 2016. They were terminated April 12th of 2016. If you turn to the next slide, which is appendix 1147, so now you have Vertex in charge with the same subcontractor and the same laborers. And you can see for the months of August, September, October, November, and December, they never even approached the manpower loading that the number of workers out on the job site that ECC had when they were terminated. This is a different question, though. This is the question of whether it was reasonable to have hired this other contractor, and that's a different and irrelevant question to whether it was reasonable for this contracting officer to terminate ECC when it did based on everything that had happened with ECC and its failures to meet any deadlines. But I think the failing the contracting officer made was his failure to evaluate whether ECC or Vertex or some other company could have completed the project faster. At the testimony, excuse me, in July of 2017 when the hearing took place, there was testimony and it's in appendix 8, page 8. The board found that as of July and August 2017, Vertex had not completed the project. Now we go back to Mr. Sunquist's contemporaneous memorandum and subsequent testimony at the hearing where he said ECC, even with all of its problems, if it had not been terminated, would have completed by November of 2016. So the government terminates. They now get the project more than one year later, which is, and the contracting officer didn't do the required analysis from 3F4, where he's required to evaluate whether, in this case, ECC or another contractor could complete the project faster. It's important because this project was for transient enlisted quarters sailors. So there was other testimony in the evidence where the contracting officer testified he had talked to the base commander and that it was very important to the government that they get this structure completed  They were in the harbor in Bahrain. So I think the failing of the government contracting officer was not doing the evaluation because if he had done the evaluation, it would have demonstrated to him that ECC, even though it was allegedly in schedule default, still would have completed the project faster than the takeover contractor. Let's hear from the government. We'll save you rebuttal time. Thank you, Your Honor. Mr. Volk. May it please the court. The board found that ECC was in default without excuse and accordingly upheld the default termination. ECC doesn't... I think, and the thing that troubles me, it's clear they were in default. It's more likely than not, perhaps, they overbid or overestimated or whatever, or the contracting officer felt that they had make representations that they had a sense they might not be able to meet. I think it's hard to argue with that. But after they were in default, they changed one or two people at the top and kept on going as they had before to complete the contract. And why isn't that a significant factor that should have been taken into consideration at the time the contracting officer, when it was clear that they were in default in terms of remedying the default? So there are a number of issues there. The first is, before even getting into the factual analysis, we have to say, how is this going to affect the conclusion as to whether they were or were not in default, which is the issue. So assuming we clear that hurdle somehow with things that happen afterwards. The second point I'd want to make on that is the record reflected that the government did not think that it was okay for the same management to be managing the project. The government was told by the surety's contractor, Vertex... They changed the people at the top. It looks as if they didn't care for the management style or emphasis or whatever. But they didn't, we're told, they didn't change anything else. The subcontractor was doing all the work. They didn't change the subcontractor. Isn't that where the delay arose in the subcontractor's performance? In the government's estimation, that subcontractor, super subcontractor that they referred to, wasn't actually the problem. The government's belief was that it was ECC's management. One of the claims or assertions that really didn't get addressed by the board because the board just found they were in default, with that excuse, was this question of whether they were paying the subcontractor. Yeah, failure to pay. So if you take ECC out of the equation, maybe Vertex will actually pay them and they'll show up and do the work. Certainly, that was the government's expectation. But just more broadly, when we look at the arguments that ECC presented to the board and is now presenting to this court, the threshold question of how does this show that you weren't in default is... So you're saying that when a contractor's in default, the government has a right to terminate that contract. And they don't have to, incident to that determination or as part of that determination, decide for sure whether it would be better to have someone else complete the contract or not. The government can simply terminate and then move forward to have the work done in any manner it sees fit? That's right. The government gets contract rights like anyone gets contract rights. And if the conditions are there for a default, it's for the government to decide what's the best way forward. There are factors that, sure, the government is supposed to consider those. That's what the FAR says. But that doesn't mean that there's some right, that that creates a source of a right for the contractor to then add a second layer of, well, yes, you might have the contract right, but now we also need to do some sort of, like, an APA review of government decision-making. That's not, there's no source for that kind of right. And so certainly the government needs to take into a variety of factors into account to decide how should we move forward. But when it comes to the litigation of whether the default will be upheld or not upheld, what the contractor needs to show is that they weren't in default. And here ECC just isn't even making those arguments. There's not really just a separate cause of action that allows ECC to claim about the, to dispute the remedy the government chooses to undertake in light of the default. There is no separate cause of action they can bring. You know, we were in default, but the government didn't choose the best interest to the government remedy, therefore we can bring a claim. And so, I don't know, it's like a quitam action or something. I don't know what it is. I do not believe that there is any right or clause or basis for ECC to be bringing any claim like that. To be sure, a contractor can bring other claims. They can say the government acted in bad faith. They can say all kinds of things about the government's conduct. But without those, there isn't just some additional layer where these decisions by the government are subject to a kind of a review of government decision-making. But even if there was a best interest clause, which there isn't, you know, idea that we would review whether the government made the right choice of who to go forward with once they deemed the contract defaulted. You know, even if we were to do that, here there's, isn't there evidence regarding why the contracting officer, I mean, maybe he didn't make all the best judgments, but why he made the determinations he did about ECC just can't be trusted for completion purposes. Right, so even if we get through all these legal hurdles of why does this even matter, why is it material, we're just ending up with ECC disagreeing with the board on its factual conclusions, but there's definitely substantial evidence for all those conclusions that the board found. The board found the contracting officer did do the right job, did look at the right factors, did make reasonable determinations on these factors, and just didn't have a basis to trust that ECC would be able to get the job done on any schedule. It just didn't have any schedule from ECC, so there's no way to compare it to what somebody else could do if you don't think that ECC can give you any reliable schedule. But at the end of the day, the question of best interest, it's for the government to decide what's in the best interest. There's not some decision for ECC or even for the court to try to decide what's in the best interest of the government. That's just something internally for the government to consider. For these reasons and those expressed more in greater detail in our brief, we respect the request that the court affirm the decision of the board. Thank you. Mr. Hare. Thank you, Your Honor. On the issue of best interest, FAR 49-401B specifically mandates, they use the term shall, that any default termination shall be in the best interest of the government. If you look at Appendix 635 and 636, there is a, the contracting officer was being questioned about what benefit the government got from terminating ECC. On line 5, the question states, what benefit did the government get from terminating ECC? The contracting answer answers, what benefits? And the question is, what benefits did you get? And the contracting officer responds, I would say there wasn't any benefit at all. This was a loss that the government gave up. And then also addressing the issue of late is late and the right of the government to terminate for default simply on the basis that a contractor is behind schedule or can't meet the contract completion date. In Alutek, which at 699, there is a specific statement in the last paragraph about the fourth line down where the court states, again, the court notes that the government cannot satisfy its burden by merely showing that the contractor was behind schedule. And the references there are to McDonnell Douglas 12, citing Lisbon again. So I think the issue is not, as the government presents it, that if the contractor is behind schedule and the contracting officer determines that he doesn't think the contractor can meet the contract completion date, that doesn't give the absolute right to terminate. Just to be clear, were you behind schedule or at the time of the termination had the completion date already passed? The completion date had already passed. So this case isn't like the ones you just cited where the contractor in those cases was behind schedule but the completion date had not yet passed. So I guess conceivably those could have been completed. There's a mix of cases on this and some of them their contractor was past the completion date, others they weren't. There was an interesting... So is it your view that there, what is the cause of action that you have to bring here? How is it that you're entitled and what are you entitled to? We believe the contractor abused his discretion because he didn't evaluate as required by the FAR. In deciding whether you were in default, he abused his discretion? No, no. Okay, so he did not abuse his discretion in deciding whether you're in default. Correct. He abused his discretion by refusing to evaluate whether ECC, the defaulting contractor, could have completed the project sooner than a replacement contractor. Even though DCX says that the contracting officer doesn't have to itemize and explain and discuss every single one of these regulatory factors, you're saying the contracting officer was in error here because the particular factor you want him to address he was required to address. If you look at this from an outcome standpoint, so the failure to evaluate, the record shows the failure to evaluate ended up costing the government a lot more money, right? So if the contracting officer is correct... That's an ex-post analysis. We're talking about this ante at the time in April when this contracting officer basically saw ECC not being able to meet not only the original deadline but was falling behind ECC's own proposed new deadlines and was losing faith in their ability to perform even to new proposed deadlines, I don't know why they needed to try to go further and say, well, now let me speculate what date I think ECC might eventually be able to hit despite what they're telling me because I can't rely on what they're telling me. And now let me go ahead and compare that to see what some unknown new contractor might be able to do. But the default termination requirement mandates that the government do exactly that. They have to be forward-looking. The requirement is, okay, you're late. Let's see if you can still finish sooner than bringing somebody else in. And that requires both with respect to any incumbent defaulting contractor as well as any potential new contractor, it requires the contracting officer to estimate, essentially, whether he thinks based on... So you would want us to say even though DCX says that the contracting officer isn't required to consider every single one of these factors, in this particular case, this particular contracting officer was required to consider this particular factor or at least more than he had done in this particular instance. This particular contracting officer, like every single default termination circumstance in every single government contract, was required to make a forward-looking analysis as to whether the defaulting incumbent could complete the project faster than a replacement contractor. And the importance of that, as stated in LUTEC, is that they state at page 690, 691, the improvident termination for default delayed completion by... So you want us to basically do a corollary to DCX. Not every factor has to be considered, but this factor has to be considered. DCX is different from the Lisbon line of cases because there was a jurisdictional determination of excusable delay at the trial level, and the same holds true for Empire and Imperial and that whole line of cases. That's a totally separate analysis, different line of questioning. That's where the merits of the delay were settled upon by the trial court and the boards in those various cases, whether they're the board or the court of federal claims. There was no dispute over abuse of discretion in the DCX, Empire, so forth. In some cases, it wasn't even brought up. In other cases, there was a determination at the trial level that the contracting officer did in fact go through the required analysis. Our argument is he didn't go through the required analysis, and if he had gone through the required analysis, he would have relied upon his scheduler who told him that ECC was going to finish by November of 2016, which would have saved at least a year on the project, and if the government was right, that in fact ECC was responsible for the delay, not only would they have gotten their project a year sooner, they would have been able to assess liquidated damages against ECC. That's the bargain they get for the harm that is supposedly caused by the delay. There's a liquidated damages clause in every construction contract of the government. So if the government is correct, and they are late, but they can finish sooner than Vertex, and the record certainly showed that they could have finished sooner than Vertex, then they would have received the project a year sooner and they would have gotten the sailors off the ship into the transient enlisted quarters a year earlier, and they could have charged ECC for being late. Determination of a default is a drastic remedy. As repeated in all of these lines of cases, it's a disfavored remedy. The contracting officer didn't go through the required analysis, and he failed to make an evaluation of what was in the best interest of the government. We don't disagree with the government. It is the government's decision as to what is required in the government's best interest. There's no right created for the contractor. Okay. Anything else, Ray? No. Okay. Thank you, Your Honor. Thank you. Thank you both. The case is taken under submission. Thank you.